IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. HERRIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
DORIS HERRIN, APPELLANT.

Filed December 31, 2013.    No. A-12-1026.

Appeal from the District Court for Dawson County: JAMES E. DOYLE IV, Judge. Affirmed.

Brian J. Davis, of Berreckman & Davis, P.C., for appellant.

Jon Bruning, Attorney General, and Nathan A. Liss for appellee.

INBODY, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Doris Herrin appeals from her conviction in the district court for Dawson County for manslaughter. She also appeals the resulting sentence of 18 to 20 years' imprisonment. Because we find no merit to her arguments on appeal or the record is insufficient for review on direct appeal, we affirm.

### BACKGROUND

On the morning of December 21, 2010, 3-year-old M.H. was in the home of her mother, Herrin, and her mother's boyfriend, Adam Jesseph, in Gothenburg, Nebraska. At some point during the morning, M.H. experienced an event that traumatized her brain and caused her to lose consciousness. Herrin and Jesseph were home at the time. Jesseph contacted his mother, informed her that M.H. had fallen and "knocked herself out," and asked for the telephone number of a medical clinic. Jesseph called the clinic seeking information about the signs of potential head injuries. He stated that M.H. had been playing in her room when he heard a crash.

- 1 -

After learning M.H. had also vomited, the clinic office manager told him to bring her in immediately.

Herrin and Jesseph instead drove M.H. to the emergency room at the Gothenburg hospital, where Dr. Craig Bartruff examined her. Dr. Bartruff noticed that her pupils were dilated and nonresponsive to light, which indicated that she suffered from a central nervous system injury. M.H.'s CAT scan showed the presence of a subdural hematoma. Dr. Bartruff noted that M.H. had bruises on her legs, a bruise on her chin, and an abrasion to her back; these marks did not cause him concern that M.H. was being abused.

Dr. Bartruff obtained a patient history from Jesseph. Jesseph advised that he and Herrin heard a "thunk" in M.H.'s bedroom and found her on the floor unresponsive. He and Herrin also noticed that she had urinated. Dr. Bartruff was concerned about how the injury occurred and, being aware of the mandatory reporting requirement for child abuse, he asked someone to contact law enforcement on his behalf.

While at the Gothenburg hospital, M.H.'s ability to breathe deteriorated and she required intubation and medical transportation to a hospital in Kearney, Nebraska. M.H. presented at the Kearney hospital with a hematoma in her brain and retinal hemorrhaging. The extensive hematoma was causing extensive brain swelling and needed to be evacuated.

A neurosurgeon at the Kearney hospital removed M.H.'s right frontal lobe in order to make room for the rest of her brain, but the measure was insufficient to relieve the swelling. A CT scan taken after the surgery showed that M.H. did not have blood supply to the entire right side of her brain or her left frontal area. At this point, M.H.'s doctors determined that her survival was unlikely. Doctors kept M.H. alive overnight using a ventilator in order to give her family time to visit. The next morning, Dr. Kenton Shaffer examined M.H. and found no evidence of brain function. The decision was made to take M.H. off of life support, and she died shortly thereafter.

*Investigation.*

While M.H. was in the hospital receiving treatment, the Gothenburg police department began investigating Herrin for child abuse. Kearney police officer Tim Beckenhauer assisted the investigation by speaking with Herrin while she was at the Kearney hospital. Herrin informed him that she woke up at about 10 a.m. on December 21. M.H. then woke up, followed by Jesseph. M.H. wanted to watch television in her room, and Herrin and Jesseph acceded to that request. Shortly afterward, Herrin and Jesseph heard a "thump" in M.H.'s bedroom, ran to the room, and found M.H. on the ground unresponsive. Herrin said they splashed water on her face and then took her to the emergency room. Officer Beckenhauer also asked whether M.H. had had any recent experiences of head trauma, including falls or car accidents, and Herrin said she had not.

Officer Beckenhauer interviewed Herrin a second time that night at the police station, because her story did not match Jesseph's. In that interview, the officers asked Herrin whether Jesseph had abused M.H. Herrin vehemently denied Jesseph's involvement in any type of child abuse, noting that he never watches her children. After the interview, Herrin made several animated telephone calls in which she expressed anger that the police might try to accuse Jesseph

of harming her child. In the telephone calls, she angrily stated that he could not have done anything because she was present the entire time.

*Autopsy.*

Dr. David Jaskierny performed an autopsy on M.H. Dr. Jaskierny determined that M.H. died from blunt force trauma to her head. He opined that the trauma caused an acute subdural hematoma, which caused M.H.'s brain to swell and prevented blood flow. He testified that M.H.'s acute subdural hematoma could not have been caused by an accidental fall.

Dr. Jaskierny rejected the theory that M.H.'s injuries were caused by reinjuring a previous hematoma that was still healing. He testified that had there been a previous hematoma, he would have observed scar tissue and iron would have been visible through staining. The absence of these suggested an acute, rather than a chronic, hematoma.

In addition to the hematoma, Dr. Jaskierny noted M.H. had bruises on the back of her head, her left jaw line, the right side of her nose, the tip of her nose, her forearms, elbows, the back of her hand, both sides of her buttocks, her legs, and the tops of her feet. Dr. Jaskierny opined that some of the bruises could potentially have resulted from medical manipulation and some of the bruises could be normal, but he did not believe that all of the bruises were sufficiently explained. A doctor at a children's advocacy center agreed that M.H.'s bruises suggested abuse rather than medical manipulation.

*Herrin's Arrest.*

The day after the autopsy, the county attorney filed a complaint and application for an arrest warrant against Herrin on the ground that she caused or permitted a minor child to be placed in a situation that endangered the child's life. After her arrest, Herrin wrote several letters from jail to various individuals, including the county attorney, M.H.'s biological father, her stepfather, and friends. The letters offered varying accounts of the events leading to M.H.'s death. At times, Herrin blamed Jesseph, and at times, she blamed M.H.'s death on the neurosurgeon or an unknown brain abnormality.

*Trial.*

Trial commenced in August 2012. At trial, both parties presented witnesses that discussed Herrin's demeanor and statements to others as well as medical opinions regarding the cause of M.H.'s injuries.

Officer Beckenhauer and some family members present at the hospital testified that Herrin's behavior seemed odd. Officer Beckenhauer noted that Herrin did not cry or seem concerned about her daughter's condition. Her behavior did not change after she was informed that M.H. could not be saved. Herrin's stepfather and Jesseph's mother also commented that Herrin was joking and that they found it inappropriate. Rather than joking, however, Herrin's mother testified that she heard Herrin crying in the chapel at the hospital and saying "I'm sorry." Herrin's sister, Shawna McEntire, testified that the day M.H. died, Herrin told her that she could not wake up M.H. and did not mean to shake her.

Some observers claimed that Jesseph seemed to be controlling Herrin while they were at the hospital. The surgery supervisor at the Gothenburg hospital testified that Jesseph nervously informed her of M.H.'s history and would not let Herrin speak. M.H.'s daycare provider similarly observed Jesseph controlling the story. Herrin's stepfather testified that Jesseph seemed

controlling. Friends who visited with Jesseph and Herrin shortly after M.H. died had conflicting opinions about Jesseph. One of Herrin's friends and her estranged husband both testified that Jesseph was controlling when Jesseph and Herrin visited the day after M.H.'s death. Another one of Herrin's friends, however, testified that she saw Herrin and Jesseph on the day of M.H.'s death and that Jesseph did not seem controlling.

In addition to presenting evidence about Herrin's demeanor, both parties presented conflicting medical evidence about the cause of M.H.'s injuries. The State presented medical evidence that M.H.'s injuries could not have been caused by a fall in the home. Dr. Shaffer was skeptical of Herrin's explanations for M.H.'s injuries. Dr. Shaffer opined that M.H.'s death was caused by "something violent," potentially including shaking or being thrown against something. He explained that M.H. presented with retinal hemorrhaging, which does not occur unless a patient experiences a great deal of force. He explained that retinal hemorrhaging comes from a shearing injury more consistent from shaking than falling. Shearing injuries come from tearing the tiny blood vessels that bridge the dura and the lining of the periosteum on the brain.

The neurosurgeon at the Kearney hospital, on the other hand, testified that M.H.'s hematoma suggested an impact injury. Herrin presented an expert witness that agreed M.H.'s injury was due to impact. Dr. David Posey testified that M.H.'s cause of death was a fall in the home complicated by blunt force trauma to the head and brain. In particular, Dr. Posey testified that M.H. suffered an acute-on-chronic subdural hematoma. He opined that M.H. suffered an injury causing a subdural hematoma on some date prior to December 21, 2010, and that an accidental fall on December 21 caused the original wound to bleed again.

The State presented the testimony of Dr. Matthais Okoye to refute Dr. Posey. Dr. Okoye disagreed with Dr. Posey's opinion that M.H. had a chronic hematoma in addition to an acute one. According to Dr. Okoye, M.H. died from a combination of shaking and impact on the head.

Amber Winkenwerder testified that while she and Herrin were inmates, Herrin told her the following: The day before M.H. died, she woke up before Herrin and would not go back to sleep. Herrin began playing a movie for M.H., but M.H. started jumping and screaming on her bed. Herrin responded by grabbing her, shaking her, telling her to shut up, and then pushing her away. As Herrin pushed M.H. away, M.H. hit her head on the wall. M.H. wet herself, her pajamas, and the bed. Herrin left to get M.H. a change of clothes, but when she came back, M.H. had bluish lips and was breathing abnormally.

Herrin impeached Winkenwerder's testimony with the testimony of other inmates who testified that Winkenwerder did not like Herrin, that the two never talked, and that they would not have been able to speak without being overheard by others.

The jury found Herrin guilty of manslaughter, and she was subsequently sentenced to 18 to 20 years' imprisonment. This timely appeal followed.

ASSIGNMENTS OF ERROR

On appeal, Herrin assigns 21 errors. Herrin argues, condensed and restated, that the trial court erred in (1) finding sufficient evidence to convict her of manslaughter, (2) approving a stipulation between Herrin's counsel and the State allowing hearsay statements, (3) allowing the State's rebuttal expert to testify after violating a sequestration order, (4) granting the State's motion to endorse additional witnesses 17 days prior to trial, (5) admitting Herrin's out-of-court

statements without first finding they were voluntary, (6) granting the State's motion in limine to exclude evidence of lawsuits against the State's rebuttal expert, (7) admitting unduly prejudicial photographs into evidence, (8) conducting hearings without Herrin after the jury began deliberating, and (9) imposing an excessive sentence. Herrin also argues that her counsel provided ineffective assistance and that the prosecutor committed misconduct.

ANALYSIS

*Sufficiency of Evidence.*

Herrin argues that insufficient evidence supports her manslaughter conviction because the State did not prove that Herrin caused M.H.'s death. We disagree.

In reviewing a criminal conviction for sufficiency of the evidence, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *Id.* When reviewing a criminal conviction for sufficiency of evidence to sustain the conviction, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Neb. Rev. Stat. § 28-305(1) (Reissue 2008) provides, "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-707(1)(a) (Cum. Supp. 2010) provides that an individual commits child abuse if she knowingly, intentionally, or negligently permits a child to be "[p]laced in a situation that endangers his or her life or physical or mental health." Read together, §§ 28-305 and 28-707 allow a jury to convict an individual for manslaughter if it finds that the individual killed a child while knowingly, intentionally, or negligently permitting her to be placed in a situation that endangered her life.

The question before this court, then, is whether or not a rational juror, considering the evidence in this case, could have found beyond a reasonable doubt that Herrin killed M.H. while knowingly, intentionally, or negligently allowing her to be in a situation that was dangerous to her life. Herrin argues that such a finding was not possible because the medical experts and treating physicians disagreed about M.H.'s cause of death and no witnesses had personal knowledge of how M.H. died. We determine that a rational juror could have made such a finding based on the evidence presented.

The basis for Herrin's insufficiency of the evidence argument is that the evidence was conflicting and that the State's witnesses were not credible. It is not the province of an appellate court, however, to assess witness credibility while reviewing the sufficiency of the evidence supporting a jury verdict. *State v. Jackson, supra.* The fact that witnesses presented different opinions and testimony about M.H.'s cause of death did not preclude the jury from accepting the testimony of one witness over the testimony of another. See *State v. Meadows*, 203 Neb. 197, 277 N.W.2d 707 (1979). Our determination is limited to the question of whether competent

- 5 -

evidence supported the jury's determination that Herrin killed M.H. while causing her to be in a situation dangerous to her life.

In this case, both Drs. Shaffer and Okoye opined that M.H.'s injuries were caused by abuse. The evidence showed that Herrin and Jesseph were the parties present at the time of M.H.'s injury. Winkenwerder testified that Herrin admitted shaking and pushing M.H. Based on this evidence, a rational juror could find Herrin abused M.H. and that abuse led to her death. Accordingly, Herrin's assignment of error is without merit.

*Stipulation Between Counsel.*

Herrin argues that the trial court erred in approving a stipulation between the defense counsel and the State. The trial court has broad discretion over the general conduct of trial. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007). We review the trial court's governance over general trial conduct for abuse of discretion.

According to Herrin, the parties stipulated not to object to any out-of-court statements made by Jesseph on the grounds that he would likely be unavailable to testify. The assumption of unavailability was derived from the fact that Jesseph pled the Fifth Amendment during his deposition. The record reveals that before the second day of trial, the State approached the trial court judge and stated:

> [State counsel]: [Defense counsel] and I have discussed the logistics of this trial and how the likely unavailability of . . . Jesseph will be in these proceedings. A deposition was taken; . . . Jesseph invoked his Fifth Amendment privilege and is likely to do the same when called in [defense counsel's] case -- [Herrin's] case later in this trial.
>
> So in order to be more efficient with time, I have agreed to not raise any hearsay objections during the testimony of my witnesses and my case in chief if questions are asked about statements by . . . Jesseph, because it's my belief and [defense counsel's] that, those statements would come in ultimately under the hearsay exception and of unavailability of the witness [sic].
>
> And for that reason, in order to not require [Herrin] to recall all of the State's witnesses, we would be waiving those objections during my case in chief. . . .
>
> THE COURT: All right. Is that the agreement?
>
> [Defense counsel]: That is the agreement.
>
> THE COURT: Okay. The agreement's approved.

Relying on *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012), Herrin argues that approving the "stipulation" was improper because Jesseph's out-of-court statements would be considered inadmissible hearsay unless the party seeking to introduce the statements proved he was unavailable. We disagree.

In *State v. Kitt, supra*, the Nebraska Supreme Court determined that a witness' unavailability could not be fully assessed until a judge orders the witness to testify. The trial court was not required to undertake the procedure outlined in *State v. Kitt, supra*, to determine Jesseph's availability because Herrin did not object to Jesseph's out-of-court statements. In *State v. Kitt, supra*, the court's obligation to compel the witness to testify in order to determine his availability was triggered by counsel's objection to the admission of hearsay testimony and the response that the testimony was admissible under Neb. Rev. Stat. § 27-804 (Reissue 2008)

because the witness was unavailable. Without an objection, however, the trial court is not obligated to determine whether or not a witness is available in order to determine the merits of a theoretical objection not actually before the court. See *Coppedge v. U.S.*, 311 F.2d 128 (D.C. Cir. 1962) (finding opposing counsel's concession that witness was unavailable to be sufficient proof of unavailability). Moreover, the issue of whether Jesseph was unavailable is not preserved for appeal because Herrin's counsel voluntarily consented to the agreement. See *State v. Roggenkamp*, 224 Neb. 914, 402 N.W.2d 682 (1987) (noting that party who has stipulated to admission of evidence cannot on appeal complain about evidence admitted in accordance with such stipulation). For these reasons, we determine this assignment of error lacks merit.

Herrin also argues that making this agreement constituted ineffective assistance of counsel. The decision about whether to make objections during trial is an aspect of trial strategy. *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013). When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics. See *State v. Nesbitt*, 279 Neb. 355, 777 N.W.2d 821 (2010). Herrin's counsel stated his reason on the record for not raising hearsay objections, but the validity of those reasons is not plainly apparent in the record before us. When the record is insufficient to adequately address a claim of ineffective assistance of counsel, we do not reach these claims on direct appeal. *State v. Ruegge*, 21 Neb. App. 249, 837 N.W.2d 593 (2013).

*Rebuttal Expert Sequestration Order.*

The court entered a sequestration order that prohibited witnesses from being in the courtroom prior to testifying. During her case in chief, Herrin presented the testimony of Dr. Posey. During this testimony, the State's rebuttal witness, Dr. Okoye, was present in the courtroom. After Herrin rested, the State called Dr. Okoye to testify. Herrin did not object or move for a mistrial.

Herrin now claims that the trial court erred in allowing Dr. Okoye to testify after violating the sequestration order. Herrin also argues that it was prosecutorial misconduct for the prosecutor to call the rebuttal witness.

In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error in resolving an issue never presented and submitted for disposition in the trial court. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013); *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007). In this instance, Herrin's failure to either object or move for a mistrial waives her claims of trial court error and prosecutorial misconduct; those issues are not properly preserved for appellate review.

Anticipating our rejection of her claim, Herrin argues that her counsel provided ineffective assistance in failing to move for a mistrial. The record is insufficient to address this claim on direct appeal.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013). To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* Ineffective assistance of counsel claims are

generally addressed through a postconviction action rather than on direct appeal. *Id*. This is frequently because the record is insufficient to review the issue on direct appeal. *Id*.

In this case, counsel's decision not to move for mistrial is a question of trial strategy that cannot be resolved on direct appeal because our record is insufficient. Therefore, we do not address it.

*Motion to Endorse Additional Witnesses.*

Seventeen days prior to trial, the State moved to endorse Donna McClement and Mandy Holsten as additional witnesses. The defense objected to the motion, arguing that it was not timely. The State responded that the witnesses were simply being called to lay foundation for letters written by Herrin that the defense had had in its possession for over a year. The State noted that both witnesses were Gothenburg residents and therefore likely available for deposition. The trial court granted the State's motion to endorse the witnesses, noting that they had a simple, factual purpose subject to quick investigation.

Herrin assigns as error the trial court's decision to grant the State's motion to endorse witnesses and also argues that the prosecutor committed misconduct by moving to endorse additional witnesses 17 days prior to trial. We disagree.

The trial court has the discretion to permit or disallow the names of additional witnesses to be endorsed upon the information after the information has been filed. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

Neb. Rev. Stat. § 29-1602 (Reissue 2008) requires a prosecutor to file an information listing the offense in the county with jurisdiction over that offense. The prosecutor must also endorse the names of witnesses known to her at the time of the filing. *Id*. The purpose of § 29-1602 is to notify the defendant as to witnesses who may testify against the defendant and to give the defendant an opportunity to investigate them. *State v. Molina, supra*. A trial court may allow a prosecutor to endorse witnesses after the information is filed, however, when doing so does not prejudice the defendant in the preparation of the defense. See *id*.

At trial, Holsten testified briefly that she was friends with Herrin and that she received a letter from Herrin stating that Jesseph shook M.H. McClement testified that she had received letters from Herrin and that she saw Herrin and Jesseph the day of M.H.'s death. She added that Herrin did not seem afraid of Jesseph. The State also asked her whether the letters from Herrin contained certain statements, including accusations that Jesseph harmed M.H.

The trial court based its ruling, in part, on its understanding that deposing the witnesses would not be difficult for the defense. Herrin did not move for a continuance based on difficulty deposing the witnesses and did not explain on appeal why she was unable to depose these two witnesses during the 17 days before trial. Without this information, we cannot say that the trial court's decision to grant the State's motion to endorse witnesses was an abuse of discretion. Accordingly, Herrin's assignment of error lacks merit.

As discussed above, prosecutors have the authority to ask the trial court to endorse additional witnesses. Herrin makes no compelling argument as to why this constitutes

misconduct. We therefore reject Herrin's argument that the prosecutor committed misconduct by moving to endorse additional witnesses.

*Voluntariness of Statements Used in Court.*

Herrin next argues that the trial court erred in admitting her out-of-court statements to Winkenwerder and McEntire without first making a finding as to their voluntariness and without instructing the jury to do the same. Herrin also argues that the State committed prosecutorial misconduct by offering these statements. We determine Herrin's arguments are not preserved for appellate review because she failed to raise the issue of voluntariness at trial.

Neb. Rev. Stat. § 29-115 (Reissue 2008) requires a party who wishes to preclude an involuntary statement must move to suppress it prior to trial, unless the defendant is surprised by the introduction of the statement at trial. In the case of surprise, the trial court has the discretion to entertain a motion to suppress. *Id*. Failure to move to suppress a statement constitutes a waiver of the objection. *Id*. A defendant claiming to be aggrieved by the use of a statement the defendant claims was made involuntarily may request a hearing on and a determination of voluntariness of the statement. In the absence of such a request, the defendant cannot complain of the failure of the court to hold such a hearing and make such a determination. *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999).

Herrin did not request a hearing on the voluntariness of her out-of-court statements or challenge the voluntariness of the statement in any way; therefore, the issue of whether or not the statements were admissible is not preserved for appellate review.

Herrin relies on *State v. Bodke*, 219 Neb. 504, 363 N.W.2d 917 (1985), and *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000), to argue that the trial court should have made a preliminary finding as to the voluntariness of her statements to Winkenwerder and McEntire. Herrin's reliance is misplaced, however, because *Bodke* and *Kula* both require a trial court to make a preliminary voluntariness finding only upon the questioned voluntariness of the statement. These cases do not abrogate the requirement of § 29-115 that a defendant move to suppress statements she claims were involuntary.

The issue of whether or not the trial court should have instructed the jury on its duty to determine whether the defendant's statement was voluntary, however, is preserved for appellate review. Where the evidence presents a question of whether a confession was voluntary, the trial court has an obligation to instruct the jury that the issue is a question of fact, whether requested to do so or not. *State v. Ross*, 183 Neb. 1, 157 N.W.2d 860 (1968). The court must further inform the jury that a defendant's confession may be considered if it is found to be voluntary but must be disregarded if it is involuntary. *Id*. Because Herrin's evidence did not present the question of voluntariness, however, the trial court was not required to instruct the jury on it.

In this case, the trial court instructed the jury to make a factual finding regarding whether Herrin's statements to police officers were voluntary, but it did not similarly instruct as to Herrin's statements to Winkenwerder and McEntire. The fact that Herrin made out-of-court admissions to these individuals, however, does not automatically raise the issue of voluntariness.

Our review of the record indicates that Herrin did not present any evidence suggesting her statements were not made freely and voluntarily. To the contrary, Herrin presented evidence and argued she did not make the statements Winkenwerder and McEntire claimed. We therefore

determine that Herrin did not raise a question of involuntariness and that the trial court was not obligated to instruct the jury on the issue. Accordingly, Herrin's assignment of error is without merit.

Herrin further argues that the prosecutor committed misconduct in offering into evidence these out-of-court statements. In a trial, the prosecutor has a duty to represent the State and to offer evidence on behalf of the State. If Herrin found that evidence objectionable, she had a duty to object and contest the offering. Herrin failed to provide any compelling argument as to why the prosecutor's actions in offering this evidence constituted misconduct. We therefore reject this assignment of error.

Finally, Herrin argues that her counsel provided ineffective assistance in failing to object to this evidence and to the prosecutor's alleged misconduct in offering this evidence. We find the record insufficient to address this claim on direct appeal.

*Motion in Limine Regarding Lawsuits*
*Against State's Expert.*
Before Herrin's case in chief, the State made an oral motion in limine to exclude cross-examination questions regarding lawsuits pending against the State's expert rebuttal witness. Herrin's counsel opposed the motion, arguing that evidence of two lawsuits pending against the expert should be admitted because they were relevant to his credibility. The trial court sustained the motion and defense counsel did not ask the State's rebuttal expert any questions about the pending lawsuits. Defense counsel did not make an offer of proof at trial.

Herrin argues that the trial court erred in granting the State's motion in limine and that her counsel was ineffective in failing to make an offer of proof at trial.

An appellate court does not have jurisdiction to consider an error assigned on the grounds that the trial court excluded evidence unless the record reveals an offer of proof or the offer was apparent from the context within which questions were asked. *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). In order to preserve the question for appellate review, the offer of proof must occur during trial rather than during an argument regarding a motion in limine. *Id.* A ruling on a motion in limine is not a final ruling on the admissibility of evidence and therefore does not present a question for appellate review. *Id.*

In this case, the defense counsel did not make an offer of proof at trial and therefore the issue is not preserved for appellate review.

Herrin also argues that her counsel was ineffective in failing to make an offer of proof at trial. Both parties concede that the record is insufficient for review of this claim on direct appeal. We agree.

*Admissibility of Photographs.*
Herrin next argues that the trial court erred in admitting photographs from M.H.'s autopsy and photographs of her pajamas. At a pretrial conference, the court reviewed the photographs the State intended to offer and made a preliminary ruling that the probative value appeared to outweigh the prejudicial effect if the State laid the appropriate foundation. The trial court emphasized the preliminary nature of its ruling and invited defense counsel to object to the exhibits again at trial. At trial, Herrin objected to several photographs from M.H.'s autopsy, on the ground that their probative value was outweighed by their potential prejudicial effect on the

- 10 -

jury. The State also offered photographs of M.H.'s pajamas, collected from Herrin's residence by police. Herrin did not object to the admission of these exhibits into evidence.

In her brief, Herrin does not identify the exhibits she seeks to challenge by number, but refers generally to the autopsy and pajama photographs. The admission of the pajama photographs is not preserved for appellate review because Herrin did not object at trial. See *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002) (noting that failure to object to evidence at trial waives objection).

As to the photographs of the autopsy, we review the trial court's ruling for abuse of discretion. *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013). The probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are admitted into evidence. *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013). Gruesome photographs are properly admitted into evidence, however, if the proper foundation is laid and the photographs illustrate or make clear some controverted issue in a homicide case. *Id.*

In this case, the experts disagreed about the extent of injury to M.H.'s brain and what the autopsy revealed as to the cause of M.H.'s death. The experts used the autopsy photographs to describe to the jury the physical markings on M.H.'s brain and what those markings revealed.

While these photographs were certainly gruesome, the jury was presented with the question of whether M.H. died from an accidental fall or from abuse. These photographs were critical to establishing the nature of M.H.'s injuries, which was necessary for the jury to make a factual finding about her cause of death. The prejudicial nature of these photographs did not outweigh their probative effect; therefore, the trial court did not abuse its discretion in admitting them into evidence.

Herrin argues that the prosecutor committed misconduct in referring to the photograph of M.H.'s pajamas during closing argument. Herrin did not object to the prosecutor's conduct nor did she move for a mistrial. Accordingly, Herrin's claims of prosecutorial misconduct are not preserved for appellate review. See *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

Herrin also argues that her counsel's failure to object to the admission of the other photographs and her failure to object to the prosecutor's closing arguments constituted ineffective assistance of counsel. The record is insufficient for us to review this claim on direct appeal. See *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

*Hearings Held Outside Herrin's Presence.*

Herrin argues that she was denied due process of law because the trial court conducted hearings without her presence after the jury had begun deliberations. We disagree.

The 5th and 14th Amendments to the U.S. Constitution and article I, § 3, of the Nebraska Constitution guarantee the right to due process of law. Article I, § 11, of the Nebraska Constitution further guarantees an accused individual the right to appear at her trial. This right has been enshrined in Neb. Rev. Stat. § 29-2001 (Reissue 2008), which provides in part, "No person indicted for a felony shall be tried unless personally present during the trial." The general rule is that an accused has the right to be present "at all stages of the trial when his absence might frustrate the fairness of the proceedings." *State v. Anderson*, 207 Neb. 51, 69, 296 N.W.2d 440, 452 (1980). In *Anderson*, the Nebraska Supreme Court determined that an accused's absence

from a hearing where his legal counsel was arguing a matter of law to the court did not "frustrate the fairness of the proceedings." *Id*.

At the three hearings in question, the trial court answered questions submitted by the jury. During the first hearing, the jury asked whether a codefendant was also being prosecuted and why he did not appear as a witness. During the second hearing, the court allowed the jury to view a DVD submitted as evidence for the second time. During the third hearing, the trial court tendered a secondary instruction to the jury regarding probable cause.

At each hearing, Herrin's counsel expressly waived her presence. Except for such basic decisions as to whether to plead guilty, waive a jury trial, or testify in her own behalf, a defendant is bound by the tactical or strategic decisions made by his or her counsel. *State v. Sayers*, 211 Neb. 555, 319 N.W.2d 438 (1982). In this case, Herrin is bound by her counsel's tactical decision to waive her presence during these hearings. Accordingly, the trial court did not err in holding the hearings outside Herrin's presence.

Herrin argues that her counsel's decision to waive her presence constituted ineffective assistance of counsel. We determine that this argument lacks merit because Herrin cannot show she was prejudiced. Herrin's sole argument on appeal is that her absence frustrated the fairness of the proceedings because her understanding of the jury's questions might have caused her to ask to take the stand in her own defense. This argument is flawed, however, because the defense had already rested and the jury had already begun deliberations before these hearings. Because Herrin's absence did not frustrate the fairness of the proceedings, she has not shown that her counsel's waiver of her presence prejudiced her. Accordingly, we reject this ineffective assistance of counsel claim.

*Right to Testify.*

Herrin next argues that her counsel failed to provide effective assistance in advising her not to testify in her own defense at trial. We determine that the record on direct appeal is insufficient to determine this assignment of error. See *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

*Excessive Sentence.*

Herrin argues that the trial court imposed an excessive sentence. We disagree.

An appellate court reviews sentences imposed by the trial court within the statutory guidelines for an abuse of discretion. *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2000). When imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education and experience, social and cultural background, past criminal record, and motivation for the offense as well as the nature of the offense and the violence involved in the commission of the crime. *State v. Huff, supra*.

Manslaughter is a Class III felony, punishable by a maximum of 1 to 20 years' imprisonment. Neb. Rev. Stat. § 28-305 (Reissue 2008); Neb. Rev. Stat. § 28-105 (Reissue 2008). Herrin received a sentence of 18 to 20 years' imprisonment and admits her sentence was within the statutory range. At sentencing, the judge stated that he considered letters written to the court as well as the statutory factors. Herrin's presentence report included a recommendation that

she be sentenced to the maximum amount of time based on the seriousness of the offense she committed, her attitude toward her offense, and the finding that she was at a "very high" risk to recidivate. In this circumstance, we cannot say that the trial court abused its discretion in sentencing Herrin.

*Cumulative Errors.*

Herrin asserts that the cumulative effect of all of the trial errors warrants reversal. We find no errors and therefore disagree.

## CONCLUSION

Because we find that there is no merit to Herrin's assignments of error or that they cannot be reviewed on direct appeal because the record is insufficient, we affirm the trial court's decision.

AFFIRMED.